Will you call the next case please? 311-0660. In re Marriage of A. Garth Baecker, Appellant Jeffrey Dunn v. Terry Joan Baecker, Appellee Steven Wakeman. Mr. Dunn. Good morning, Your Honors. I'm here on behalf of the appellant, Aaron Garth Baecker. My office represented him in the dissolution proceedings in Tazewell County, and this is an appeal of the motion for vacation of an oral agreement that was denied by the trial court and the enforcement of a petition to enforce an oral settlement agreement that was granted. The enforcement was obviously filed by the wife. Basically, I know you guys have all read the brief, and so I don't want to rehash a bunch of the facts, but I think some of the facts are important in this case. My client, in February of 2010, filed his petition for dissolution of marriage. Almost immediately thereafter, he was arrested and charged with attempted first degree murder. From the middle of February until the current day, he has either been incarcerated in the Tazewell County Jail or the Illinois Department of Corrections. He remains in the Illinois Department of Corrections for another 16 years after being found guilty of attempted murder. That threw a very big hindrance in this case. Subsequent to all of this, on April 19, 2010, the court froze all of my client's assets pursuant to an injunction. That injunction essentially crippled my client from a monetary and asset standpoint. Which, as this case proceeded, the big issues and one of the focal points of the agreement that we're going to discuss was the payment of my client's attorney's fees. We had the first day of trial on February 7. It was scheduled for a second day of trial on March 23, 2011. On March 21, I was able to meet with Mr. Baker up in the Dixon Correctional Facility to prepare for that day of trial. On March 22nd at approximately 4.30pm-5pm, my law partner Ed Murphy and myself were going through the final exhibits and we decided to call Mr. Wakeman, Terry Baker's attorney, to see if there was any possible settlement that could be had in this case. Pursuant to those discussions, it went back and forth for probably 15 to 20 minutes. At the end of those discussions, we had come to what we thought, as the attorneys, would be a reasonable resolution of the pending issues. At that point, I scrambled to call Mr. Baker at the Dixon Correctional Facility at approximately 5pm on the night before the trial. He was able to speak with me for maybe 15 or 20 minutes. He had no documents in front of him. He had nothing to view what we were saying actually meant. He was able to hear, this is what you're going to keep, this is what she's going to keep, this is what you're going to receive, this is what you're going to pay, this is what she's going to pay. At the end of that discussion, it was a reluctant approval, but it was an approval. So the next day we go into court for the trial. At the trial, we tell the judge, look, we believe we have an agreement. The issue was that even before we were able to recite the agreement, Mr. Wakeman and myself, so on behalf of our parties, had disagreements as to the actual terms of what that agreement was. The agreement ultimately, from our end, there was no meeting of the minds. There was mutual mistakes of fact. That's not what you told me. You were in court that day, right? I was that day. You heard Judge Maher, or Mayor, I'm not quite sure how to pronounce that, but she asked Mrs. Baker, went through the whole drill, you understand that if you agree to this today, this is it, right? She did ask Mrs. Baker. And went through that whole litany as you stood there, and then I think Mr. Wakeman says, well Judge, would you talk to Mr. Dunn about that? And you assured the court that you had your client's approval on that settlement, right? I did, conditionally or not. And the condition I mean is this. If you look at what was actually read on the court's record as the agreement, Mr. Wakeman stated, with regard to the payment of the attorney's fees and the sale of the car, which we were saying are the material elements that were in dispute, that Mr. Wakeman's position was that my office was to receive up to $25,000 from the sale of the car. And if you look at the transcript, almost the next sentence out of my mouth was, no, we are to receive the first $25,000, which is a difference. And then when you look at what the court actually entered, Your Honor, on June 7th, when Mrs. Baker filed her motion for the entry of the final judgment in enforcement of the Orr Settlement Agreement, Judge Mayer specifically told all of the parties present, which would have only been Mrs. Baker and the two attorneys, that she was going to enter a final judgment that comported with the exact terms that were read onto the court's record on March 23rd. And if you look at that final judgment, Judge, there's two blanks that are left in there. The amount of fees that's going to be paid to my office, and the terms of the sale of the vehicle. Let me ask you this. How are your fees in any way material to Mrs. Baker? Or how do they get paid? Because the attorney's fees, Judge, in any case are a material aspect of the dissolution matters. But other than the fact, well, true. But in this case, the fees were coming out of your client's assets, right? No. What was given. The car, $25,000 from the sale of this car was going to go to you. You made it plain that you wanted that money coming directly to you first, and then anything above that was going to Mrs. Baker. That is a correct statement that the attorney's fees were to be paid from the mayoral assets, which the sale of the car was, yes. Okay. And that was what you and Mr. Wakeman agreed to, right? $25,000 from the sale of that Mercedes would go to your law firm first, and of course it's being credited to Mr. Baker's assets. But in fact, it's going to be paid to you, Mr. Murphy. And then the rest of it would go, anything at all that was above $25,000 would go to Mrs. Baker. But that wasn't our agreement on March 23rd. What was your agreement? That is our whole point in being here today, is that we didn't have an agreement on that. And as the case progressed, and after that March 23rd date, it became readily apparent that when we had an agreement on, let's call it the general principles of what everybody was going to do, the real details and the nuts and bolts of it were not agreed upon at all. And that's where it comes in the future, that if you look at the conduct of the parties after that March 23rd date, Mrs. Baker changed her position on those fees, multiple times in fact. My client changed his position on what he thought the terms of the agreement were. My client immediately tried to repudiate that agreement and said that he didn't agree with it. Well, didn't he say that because he went back to his cell and figured out that by the time he got done paying his judgments that there wouldn't be much left for him? No, I don't believe he said that, Your Honor. I believe that he said that he just did not feel that it was a reasonable and equitable settlement. Now, obviously taking into consideration the judgment that was outstanding against her, that is a true statement. But when you look at the difference in Mrs. Baker's conduct after the agreement, where on July 6th she filed a petition saying that we should not get any of that $25,000, and that should all come to her because there had been an interim fee award that awarded Mr. Baker $35,000 out of a non-marital asset. So she was again changing her position. And then on August 18th, when this original final judgment had been entered with blanks, so obviously it wasn't a final and appealable order. We needed an order that was final. We filed a motion for a final and appealable order to fill in those blanks so that we could get up here in front of you to say this oral agreement should have never been enforced. They again changed their position and said, you know what? We agree. We'll come back and we will agree that you guys are to get up to, or excuse me, you will get the first $25,000. So they changed their position from saying up to, because until that point, Mrs. Baker's position had always been you weren't getting $25,000, Murphy and Dunn from Mr. Baker, because you weren't technically owed that amount. That's what it was originally. That's why it was up to versus whether you got $25,000 from the car or up to that amount. So they changed their position again. And if you look at what Mrs. Baker even said when the judge was going through, okay, is this your agreement? Well, I haven't had a chance to really review it. I agree to the intent. And then the last thing she says is, well, I haven't really spent a lot of time looking at this. What was the size of this marital estate? About $1.8 million. Okay. And $25,000 is what percentage of that? It's probably a minute percentage, Your Honor. So is that anything really material to the meeting of the minds on this settlement? We believe it is, Your Honor, because the primary focus from Mr. Baker's end was maintaining representation throughout this entire case. And if you look at the record, there was at least five fee petitions filed once Mrs. Baker and the court froze my client's assets. And so to say that it's minute in the scheme of $1.8 million, I would be unreasonable if I said that wasn't true. But when you look at the crux of what these agreements were on March 22nd, that was a major portion of what this agreement was. It's how Mr. Baker's fees were going to get paid so that he would continue to have representation. Because at that time, the last petition that was filed on fees was a petition for fees and or a motion to withdraw. Mr. Baker, by the time we got to that, owed us over that $25,000 mark. And if we were not going to get our fees, we were not going to be able to continue to represent Mr. Baker. And he wanted to continue to have competent legal representation because he was in prison. He's not an attorney. He was not prepared to represent himself. And so from that standpoint, it is an essential element of the case. And like I said before, attorney's fees are an essential element of every dissolution case. And you can't have a settlement agreement that doesn't deal with that. We also made the argument, I think, that the terms in Gross were unconscionable. That unconscionability, Judge, is an extension of the duress and everything that happened in this case. How could you be under any less duress in the world than to be sitting in a jail cell without a care in the world? Because, Judge, on the eve of trial at 5 p.m., when the trial is to start at 9 a.m. the next morning and you get a telephone call from your attorney saying, hey, I just talked to the other side and, you know, here's what everyone's proposing, what do you think? And this is on a $1.8 million case where he's got a lot at stake. And so for me to have a 15-minute telephone call with him because that's what he was allowed of a Dixon, that was duress to make a snap judgment call on something that was— Well, why wasn't he present at trial? Because he had chose not to be present at trial. Okay, so he chose not to be present and then he complains that he wasn't present on his joints. No, Your Honor, he complains that he was not present for the settlement negotiation process and not available on the next day because when we went to court the next day, Mrs. Baker and Mr. Wakeman were still trying to change the agreement. There was personal property issues that were being changed. There was, obviously, I said the terms of the vehicle were being changed. The amount was being disputed. Mrs. Baker testified herself that she hadn't even really gone through it and understood what was going on. I mean, you look at duress and the definition of it by all the case laws, it talks about these things are hastily contrived agreements. It doesn't get any more hasty than a 15-minute phone call the night before the second day of your trial. Did you ask for a continuance? I did not. And did you say that you all have agreed now? Say that again, Your Honor. Did you say that the two of you, you and Mr. Wakeman, had come to an agreement now? I don't know if I said that or not, Your Honor. Did you? I don't know. I did not read my transcript. But I can tell you that I did believe we had an agreement on the general terms. The issue became, as I noted to Judge Schmidt, that when we were reciting the agreement, I specifically said on the record that there was a discrepancy between what Mr. Wakeman was saying and what I was saying, and I also noted that I hadn't shown my client any of these documents that Mr. Wakeman was purporting at that time. Because obviously on March 21st, when I went and prepared for the second day of trial with the client, we didn't have those proposals, there had been no settlement negotiations, and we had spent a substantial amount of that time preparing the dissipation claim that my client had made against Mrs. Baker for gambling. And so I don't know that I said whether we had an agreement or not. No, I was asking, I thought that you said, I may have misheard you, I thought that you said just now that you and Mr. Wakeman now have agreed on the term? No, what happened was on the August 18th hearing date when we filed our motion to amend the final judgment and to enter a final and appealable order, we showed up at the hearing and Mr. Wakeman and Mrs. Baker then came in and agreed to it was going to be the first $25,000. And that the reserve price on the sale of the vehicle would be $25,000 if it was required to be sold on eBay. Again, that motion was filed solely to get a final and appealable order to get out of the trial court and out to the appellate court. There was no waiver of any objection to whether there was an enforceable agreement or not. Mr. Baker stands by his position that there was no meeting of the mind, there was mutual mistakes of fact, and there was not a complete and enforceable agreement as of the time of March 23rd, which is the question. Counsel, that's two minutes. Thank you. Well, at some point in your brief, in fact, you made the comment, well, the agreement later fell apart. It did. Then you can't follow up, if there's no agreement, there's nothing to fall apart, right? As I previously indicated, Your Honor, that the general terms of the agreement were what we believed existed, not the real details of everything that was happening. And then when the days moved on beyond March 23rd, it became clearly apparent that these two parties really, and the attorneys themselves, did not agree on the understanding of how the agreement was to be drafted, what the actual terms were, and who was going to do what. Because in order to have a final and appealable judgment, the only thing that should happen is the court could enforce it. Well, if you look at that judgment that was entered on June 7th, no one can enforce that because there's blanks in it. How do you have a final and appealable or an enforceable agreement between parties when there's blanks in the agreement, when no one knows what those numbers are? And you'll hear soon that Mr. Wakeman and Ms. Baker think that those blanks were Scribner's errors. They weren't Scribner's errors. They were blanks because we did not agree on March 23rd, at the time that the court wants to enforce this oral settlement agreement. There was no agreement on those terms. Then I guess where I'm perplexed is then why did you stand in open court and tell Judge Mayer that there was an agreement? I don't believe I necessarily – again, Judge, it's all about the general intent agreement versus the specific details of the agreement. Mr. Wakeman even noted in his testimony to the court that no one's read his documents, that it needs to be taken to the parties and the attorneys to proofread the language to make sure this is the agreement. So the general terms were recited, but the specific details and what ultimately ended up meaning a breakdown of those general terms happened. And so on that day when we went in there on March 23rd, were the general terms agreed upon? I believe so. But then as subsequent days followed, and even actually, I'm going to say on that day they necessarily weren't, because Mr. Wakeman and I disagreed in court on what the language was and how it was to be written. And if you think about it, whether you get up to the first 25 or you get the first 25 are two different terms. You have blanks in your agreement. I understand I was in court, and I understand that I told the court that I did talk to Mr. Baker about these general principles. But what ultimately resulted, or was attempted to be resulted as the agreement of the parties, was not what Mr. Wakeman and I talked about, and not what Mr. Wakeman and Mr. Murphy talked about. If you have no further questions. No, thank you, Mr. Dunn. Mr. Wakeman? Thank you. May I ask for your support? Counsel? I represent Terry Baker, the appellee, who is seated in the front row in the gallery. I suggest to this court that the real issue here is whether a party to a divorce case who is represented by counsel and who agrees to a settlement of the case on the record in open court can back out of that settlement and have it vacated because he's had a change of mind. I will address the issues in this appeal, if I may, in the reverse order that we presented them in our appellee's brief. First, Garth Baker claims that the settlement was unconscionable. It is not. Ed Murphy admitted at a hearing in open court on April 29, 2011, that this settlement was essentially a 58-42% split of the marital assets, with Terry Baker receiving approximately 58% of those marital assets and Garth receiving 42%, which Mr. Murphy admitted was a reasonable settlement for this divorce case, particularly because of the proven extent of Garth Baker's dissipation. The second issue he has raised, Garth claims that the settlement was a result of duress or coercion, essentially the same thing under the law. Yet there is no illegal or immoral conduct on the part of Terry Baker. And under the decisional law in this state and from this court in Thompson v. Thompson, 91 Illinois Appellate 3rd 943, a 1980 decision, for there to be duress or coercion that would invalidate a settlement agreement, there must be some illegal or improper conduct on the part of the opposing party. Not only is there none here, none has even been alleged by Mr. Baker. I submit that any emotional stress that Mr. Baker may have been under was probably created by his own guilty conscience for his own misdeeds. Clearly, there is no duress under the decisional law of this state. Mr. Baker's third claim is that there was no meeting of the minds, that there were not all material terms agreed upon. I think he's told you about there being a blank or two blanks that were left in the what is called final judgment of dissolution of marriage. It wasn't actually the final judgment. The final judgment came after it was amended. But nonetheless, as Justice Schmidt correctly pointed out in questioning Mr. Dunn, Mr. Dunn sat in court at council table, listened to the recitation of the terms and conditions of the oral settlement agreement, and agreed that those were in fact the terms and conditions that were agreed upon in the settlement. He also represented that he had talked with his client and his client agreed to those terms. He represented he had his client's authority to enter into this settlement agreement and that he had advised his client and discussed with him the assets, debts, liabilities, and the terms and that his client agreed and approved to that. That was all reflected on the record at the hearing on March 23, 2011, before Judge Mayer approved the settlement. Now Garth claims, well, there were blanks that were left in the judgment of dissolution, which was approved by the court on June the 7th. And therefore, because there were blanks in this, there must be a mutual mistake of fact. He points to the fact that there was a recitation by me that part of the terms of the settlement were that Mr. Baker's Mercedes-Benz automobile would be sold and that the first $25,000 of the sales price would be paid to Mr. Baker's attorney, Murphy & Dunn, as a payment towards his attorney's fees, with the balance of any proceeds then to be paid as part of the marital property going to Terry Baker. Again, that was part of the recitation and he says, well, up to $25,000, he says it was supposed to be $25,000. I acknowledge there could be a difference on that issue, whether or not it was to be up to $25,000 or $25,000, because both are reflected in the recitation before the court. But either way, that is not a material difference. At that point, the attorney's fees that were incurred, represented by Mr. Dunn, were something more than $20,000. So we know it was more than $20,000 and perhaps as much as $25,000. That was capped. So is that material? Well, we're talking about less than $5,000 out of the total assets of something, I'll accept this figure, $1.8 million. I haven't done the math, but I think it's less than half of 1%, is what there could be a difference. But more importantly, that judgment was amended, and Mr. Baker got exactly what he was asking for, what the parties agreed to. It was amended to reflect that the car would be sold, and $25,000 would be paid from the sale of the car to Murphy and Dunn as a contribution towards Garth's attorney's fees. That was, in fact, done. Let me back up. The order then that he is appealing from, the final judgment in this case, was the order as of August 18, 2011, in which Judge Mayer granted Garth's motion to amend the final judgment, which clearly wasn't final until the amendment took place, with no objection, I might add. And that order clearly makes clear that the car would be sold, and yes, in fact, the first $25,000 from the sales price would be paid to Murphy and Dunn. So the point he said was not agreed to, because it was either up to $25,000, was amended to give him exactly what he said the order was supposed to reflect and what the agreement was, $25,000. In fact, since the briefing in this case, the car has been sold, and Murphy and Dunn have been paid that full $25,000. The point, however, being that at the time of the order appealed from, which has now been amended, any issue about a blank being left in that order has been cured. And the benefit of the bargain that Mr. Baker asked for, which was that $25,000 of his attorney's fees be paid from the sale of the car, the amended order did exactly that. He got exactly what Mr. Dunn says was the bargain that was struck. And what transpired in the interim doesn't really make much difference, because the final order in this case, which is the judgment appealed from, is exactly what that oral settlement agreement reflected. Which brings me then to the fourth issue. This appeal, I submit, is moot. As to whether there was a blank term in some order, as to whether or not there was some material difference between up to $25,000 and $25,000, that has been fixed, that has been cured. Now, Garth claims that there was no provision in the order as originally tendered for the payment of $25,000. It was up to. Well, the judgment as appealed and as amended reflects that Garth Baker got everything that he bargained for in this settlement agreement. And therefore, the issue of whether there was some agreement on all material terms, I submit, is now moot. What he says the deal was is what he got. It's been paid. And there is no issue before this court, because it's been completed. The last issue I guess I want to raise is an issue that we, on behalf of Terry Baker, have raised, and that is waiver. Garth failed to raise issues in the trial court as to his claim that there was no meeting of the binds, that there was a mutual mistake, that this was produced under duress, and that the settlement was unconscionable. Since these arguments were not raised before Judge Mayer in the trial court, they should be deemed waived on appeal by this court. Simply put, Garth Baker changed his mind about this settlement. He wants to back out. I submit there is no legal justification to vacate this settlement agreement. They proposed the settlement. Mr. Dunn had spent six hours with the man, a day and a half before the trial was scheduled and before the settlement, at the prison. He, of course, says, well, he had only a 15 or 20-minute phone call. I can't disprove counsel's statements because I wasn't privy to them, but there is no facts really properly in the record about what took place in the conversation between Garth Baker and his attorneys, except that Mr. Dunn represented in open court to Judge Mayer before she approved this, that he had discussed all of this and he had his client's approval. I submit this is a gentleman who sits in a prison cell with time on his hands and has nothing better to do but to blame all of his problems on his ex-wife, whom he hates. Continuing to litigate this case against her is his only known form of recreation. His excuse that I only had 20 minutes to consider this is no legal justification for vacating this settlement. Judge Mayer correctly and properly denied the motion to vacate that was filed by Garth. She correctly and properly granted the motion to enforce the settlement agreement. Her decision was correct. It certainly cannot be said that her decision was against the manifest weight of the evidence. For these reasons, we ask this court to affirm the decision of the Circuit Court of Castle County. Thank you. Are there any questions? No. Thank you, Mr. Wakeman. Mr. Dunn, shall we bubble? Thank you, Your Honor. I will start with Mr. Wakeman's waiver argument. If you look at the April 25, 2010 motion to vacate, I will agree with Mr. Wakeman that the legal buzzwords of mutual mistake or contract formation or meeting of the minds, they're not in there. If you look at what's actually said in there, it's all in there. It talks about the parties had a guarantee on what was going to happen. This is how the car was going to be sold. This is what was supposed to be the case. It wasn't at the end of the day. So for Mr. Wakeman to say that Mr. Baker never raised these issues on the trial court level is not correct. Has the car been sold? It has now, yes. Did you get 25K out of that sale? Yes, my office did. So why isn't that issue moved like Mr. Wakeman just did? Because Mr. Wakeman is approaching this appeal, Your Honor, from the standpoint of Mr. Baker's arguments being solely about the final judgment, which they are in part, but what Mr. Baker's appeal is about is that there was no enforceable oral settlement agreement reached on March 22 or March 23. That's what this appeal is about. This appeal isn't about the amendment to the final judgment that was done on August 18. It's whether there was a meeting of the minds and an agreement to the essential terms of the agreement and did the parties walk away on March 23 with a full and complete agreement. So it's about something other than the car. It's about the entire process, Your Honor. It's not just the car issue. The car issue is just one element that can be clearly represented in this court that the parties did not have a meeting of the minds. In what other area didn't they have a meeting of the minds? They did not have a meeting of the minds as to the amount of payments that Garth was to receive for his attorney's fees, the method in which the car was going to be done. Okay, but something that has nothing to do with the car. We've already decided the car is going to be paid. Let's not talk about the car. Personal property, Your Honor. Pardon? Personal property, the distribution of the personal property in the case. Mrs. Baker wanted certain heirlooms to be transferred from what we thought was going to go to Mr. Baker to her son, and that was a big deal at the courthouse that everything had to stop, and there was a disagreement out in the hall about that. There were some issues, Your Honor, that the car is just a good example of how there's not a meeting of the minds, and what they thought was an agreement ultimately ended up not being an agreement. Is there a remaining controversy here? There potentially is, yes, Your Honor, because we don't believe there. Is there a remaining controversy? The final judgment that ran on August 18th? As amended. As amended by my client, yes. My client believes there's no enforceable agreement. And so whether that's the June 7th final judgment that has blanks in it or the August 18th final judgment that filled in those blanks with $25,000, if you say could you as a court walk into that final judgment and say, okay, now I understand that Mr. Baker is required to do A and Mrs. Baker is required to do B, so from that standpoint is there still a dispute? I guess not. But if you look at what the appeal is about, whether there was an enforceable agreement, yes, there still remains a dispute at this time. And I know that's kind of a roundabout way of answering it, but that's the answer here is that the dispute is on the enforcement of an oral settlement agreement, not the final judgment. And what we're disputing is that the court abused its discretion in not vacating the party's agreement long before the written version was ever entered. And so from that standpoint, I'll go back to my waiver argument, that even if you guys believe that he didn't bring those arguments up at the trial court, that the case law says that the reviewing court has the ability to review those issues to find a just and ensure a just and equitable result took place. As far as the mootness goes, that's what we were just talking about, Your Honor, that the mootness, we don't believe this is moot. We believe that the mootness of the August 18th order, sure, the blanks have been filled in, but that's not the crux of our dispute here today. Our dispute is that they didn't have an enforceable oral argument back on March 23rd, and if they didn't have an enforceable argument on March 23rd, then the final judgments and everything else coming after the fact were all done improperly. Counsel, one minute. So from that standpoint, that's where we're really at as far as what we're appealing, and whether it's the August judgment that Justice McDade was asking about, it's not. It's the March 23rd agreement that we're disputing. But you'd agree that Mr. Baker's privately retained and well-paid personal counsel stated in open court to the judge that there was an agreement. Say that again? You agreed to open court that on March 23rd you told the court that you represented Mr. Baker and that there was an agreement. There was an intent of the agreement, as Mrs. Baker referenced. That's how I would classify it now. That on that day in court did I tell Judge Mayer that I believe the parties had an agreement? Yes, I did. And you heard her saying that there's no backing out of this. Either there is or there isn't. She never asked me those questions, Your Honor. She did ask Mrs. Baker. Well, you're a lawyer. You knew they applied to your class, too, right? Absolutely. I do not disagree with that. But where it comes into play, Your Honor, is that after that day is when everything fell apart. When you really got into the nitty-gritty of the agreement, it all fell apart. Okay. Does anybody have any further questions? All right. Thanks, Mr. Dunn. Thank you, Your Honor. Mr. Wakeland, thank you, too. The matter will be taken under advisement. A written disposition will be issued. Right now, the court will be in brief recess for a panel session. Thank you.